# UNITED STATES DISTRICT COURT FOR THE SOUTH EASTERN DISTRICT OF MISSOURI DIVISION

J. Y, P (Minor-Child),

    **Plaintiff,**

VS.

A2B CARGO LOGISTICS, INC.

A2B CARGO, INC. and COLEMAN

STRACHMAN,

    **Defendants.**

Case No._____

JURY TRIAL
DEMANDED
BY -12

## COMPLAINT FOR A CIVIL CASE ALLEGING NEGLIGENCE
(28 U.S.C. § 1332; Diversity of Citizenship)

Comes Now, Plaintiff, J. Y, P, by way of is father, Gregory Peet, Pro Se, and make a claim for personal injurys, allege as follows:

## COUNT I

### GENERAL ALLEGATIONS

1. Plaintiff, J. Y, P, is a Minor Child residing at 311 Lee Ave, Sikeston, Missouri 63801, Scott County, with his biological parent's Audrea Peet and Gregory Peet.

2. Defendant, A2B CARGO LOGISTICS, INC. (LOGISTICS) is a Federal Motor Carrier

Safety Administration (FMCSA) authorized interstate freight shipping broker conducting its business under US DOT #3187256 throughout Illinois and the United States. It may be served at its Main Office located at 12161 S. Central Avenue. Suite 212, Alsip, IL 60803.

3. At all times herein relevant, Defendant, A2B CARGO, INC. (CARGO) was an FMCSA Interstate Motor Carrier operating and conducting an interstate commercial business of transporting freight throughout Illinois and the United States under USDOT #2579900.

4. At all times herein relevant, Defendants, LOGISTICS and CARGO, acted together in joint venture with each other both, as principal and agent for each other in their joint venture of brokering and transporting commercial freight throughout the United States.

5. At all times herein relevant, Defendant, COLEMAN STRACHMAN, was employed by Defendants as a driver of their 2015 Freightliner Tracfor Trailer bearing Illinois registration P1026569 and acted as an employee and agent on behalf of each Defendant, LOGISTICS and CARGO, as well as their joint venture of brokering and transporting commercial freight interstate throughout Illinois and the United States.

6. Defendant, COLEMAN STRACHMAN, resides and may be served at 711 Queen Street, Sharpsburg, North Carolina, 27878.

7. This court has proper diversity jurisdiction over the named persons, corporate entities and subject matter of this Complaint under U. S. C. 1332. The amount in controversy is one million dollars ( $1,000,000.00 ).

8. Defendant driver, COLEMAN STRACHMAN, was hired, qualified, supervised, trained, dispatched and directed by Defendants, LOGISTICS and CARGO.

9. At all times herein relevant, Defendant, COLEMAN STRACHMAN, was operating a

2

commercial motor vehicle in interstate commerce under the direction and control of Defendants, LOGISTICS and CARGO.

10. At all times herein relevant Defendant, COLEMAN STRACHMAN (driver), was acting within the course and scope of his employment by, Defendants, LOGISTICS and CARGO. Therefore his negligent actions and omissions, as alleged herein, were the actions and omissions of Defendants, LOGISTICS and CARGO, under the doctrines of *Respondent Superior and Vicarious Liability*.

11. On or about June 28, 2019, Plaintiffs', J. Y, P , was a passenger in a motor vehicle headed eastbound on US 24 near mile marker 51.75 in Kuttawa, Kentucky.

12. At the above-mentioned time and place the commercial vehicle operated by Defendant, COLEMAN STRACHMAN, for his employers, Defendants, LOGISTICS and CARGO was eastbound on US 24 near mile marker 51.75 in Kuttawa, Kentucky behind the vehicle occupied by Plaintiff, J. Y. P .

13. At the above-mentioned time and place the vehicle occupied by Plaintiff, J. Y, P , stopped for traffic ahead of it on US 24 near mile marker 51.75.

14. At the above-mentioned time and place the commercial motor vehicle operated by Defendant, COLEMAN STRACHMAN, for his employers, Defendants, LOGISTICS and CARGO, collided violently with the back of eleven (11) eastbound vehicles all stopped in traffic due to road construction one was occupied by Plaintiff, J. Y, P , causing him to suffer painful, serious, back, neck, leg, wrist, shoulder and head injuries.

15. At the above-mentioned time and place the commercial Motor vehicle owned,

operated and leased by Defendants, LOGISTICS, CARGO and COLEMAN STRACHMAN, that collided with the private vehicle in which Plaintiff was a passenger was dispatched, supervised, maintained, monitored, operated, and controlled by the department of operations, or the fleet management of Defendants, LOGISTICS and CARGO.

16. At all times herein relevant, Defendants, LOGISTICS and CARGO, were operating a fleet of Motor vehicles, trucks and other vehicles jointly as a broker and Motor carrier as defined by the Federal Motor Carrier Safety Regulations (FMCSR) throughout the United States.

17. At all times herein relevant, Defendants, LOGISTICS and CARGO, and their Driver, Defendant, COLEMAN STRACHMAN, operated under authority granted by the United States Department of Transportation (DOT) under their respective DOT licenses.

18. 49 C.F.R. § 390.3(e) (l) & (2) provide that every driver and employee shall be instructed regarding and shall comply with all applicable regulations contained in the FMCSR.

19. 49 C.F.R. § 390.4 provides that "motor carrier" means a for-hire Motor carrier or a private motor carrier which includes a motor carrier's agents, officers, and representatives as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers.

20. 49 CFR § 3 71.2 (a): provides that " Broker" means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. ... All brokers regulated by FMC SA are required to use the services of authorized motor carriers.

21. Defendants, LOGISTICS and CARGO, were at all material times a ·'broker",

4

"motor carrier" and an "employer" of their driver, Defendant, COLEMAN STRACHMAN, as defined in 49 C.F.R. §382.107.

22. 49 U.S.C. § 14704 (a) (2) provides that "A carrier ... is liable for damages sustained by a person as a result of an action or omission of that carrier. .. in violation of this part."

23. 49 U.S.C. § 14101 (a) provides that "a motor carrier shall provide safe and adequate service, equipment and facilities." Defendants, LOGISTICS and CARGO, and their driver, Defendant, COLEMAN STRACHMAN, negligently and wantonly failed to provide safe and adequate service which proximately caused painful injuries and damages to Plaintiff, J. Y, Peet.

24. The FMCSR can be found at 49 C.F.R. § 390 et seq. The FMCSR and the MCA, specifically, under the section 40 C.F.R. § 391.1 (a) states "(a) The rules in this part establish minimum qualifications for persons who drive commercial motor vehicles, as for, or on behalf of motor carriers. The rules in this part also establish minimum duties of motor carriers with respect to the qualification of drivers. The FMCSR set forth the applicable minimum industry standard of care including the minimum qualifications for drivers and the minimum duties for drivers under 49 C.F.R. § 391.1 (a) & (b).

25. The Plaintiff attaches and incorporates Exhibits (A-C) which establishes that Defendants, LOGISTICS and CARGO, have a habit, custom and pattern of business activity of failing to comply with the BASICs and FMCSRs under the guidelines and regulations adopted and implemented by the DOT and their administrative branch, the Federal Motor Carrier Safety Administration (FMCSA) under the code of federal regulations.

26. Exhibit A establishes a serious history and on going pattern of Unsafe Driving, Hours-of-Service compliance issues, and Vehicle Maintenance issues exemplified as follows:

a.) Commencing December 28, 2015 Defendants received a safety "Alert" notification which rated them in the bottom 10% of all licensed interstate Motor carriers operating in the U.S.A. for unsafe driving; (page 1 of 92)

b.) On January 29, 2016 Defendants received another safety "Alert" for unsafe driving. Their unsafe driving rating had dropped to the bottom 6% of all licensed interstate Motor carriers; (pages 1-2 of 92)

c.) On February 26, 2016 Defendants received another safety "Alert" for unsafe driving. Their unsafe driving rating dropped further to the bottom 4% of all licensed interstate Motor carriers; (pages 1-2 of 92)

d.) On March 25, 2016 Defendants received another safety "Alert" for unsafe driving. Their unsafe driving rating remained at the bottom 4% of all licensed interstate Motor carriers; (pages 1-2 of 92)

e.) By May 27, 2016 Defendants had received consecutive monthly safety alerts for unsafe driving and additionally received a safety "Alert" for Hours of service compliance (HOS) violations: (pages 1-2, 17 of 92)

f.) These consecutive safety "Alert" notifications for both unsafe driving and hours of service compliance (HOS) violations were issued monthly to Defendants up to June 28, 2019 the date of the subject crash; (pages 1- 92)

g.) Additionally, by January 26, 2018 Defendants' crash rate increased and they received an additional safety "Alert" for their crash indicator as well as their unsafe driving record and their (HOS) hours of service violations; (pages 1- 92)

h.) Commencing May 25, 2018 and continuing to June 28, 2019 Defendants also received consecutive monthly safety "Alerts" in four categories Unsafe driving, Hours of Service compliance violations, Vehicle maintenance and Crash indicator; (pages 1- 92)

i.) A four year summary included in Exhibit A demonstrates an increasing yearly crash rate from 2016 to the present that has averaged 5.7 crashes; (pages 1- 92)

j.) As demonstrated by this exhibit, throughout this period of time despite receiving numerous consecutive safety "Alerts" Defendants took no measures to correct their operating practices or to improve their safety record. (See Attaced Exhibits - A, B, and C).

This record of FMCSR and BASICs safety violations by Defendants demonstrates an ongoing pattern of unsafe operation by Defendants, individually and by their joint venture in conducting their business as an interstate motor carrier which contributed to proximately cause the crash and painful injuries of plaintiff J. Y, P          .

## SUPPORTING AFFIDAVIT AND STATEMENT OF FACTS

27. Plaintiff re-alleges the allegations contained in paragraphs one (1) through twenty-six (26) above as if though fully set forth herein.

28. On June 28, 2019 at approoximatly 4:20 pm, We the Peet's was traveling home from visiting family in Sikeston, Missouri in a 2018 F-150 rental, traveling east in the far-right lane of the I-24 east.

29. My wife Audrea Peet was the driver. I, Gregory Peet was in the front passenger seat, we both had our seat belts securely fasten. My son O. J, Peet age 3 was in his car seat on driver side rear seat with seat belts securely fasten. My son J. Y. Peet age 2 was in his car seat on passenger side rear seat with seat belts securely fasten.

30. At all times, Audrea was observing the posted speed limit 70 mph, and fully aware of surrounding traffic. As we came over a hill approoximatly at the 50 mm on I-24 east we notice that both the right and left lanes were at a dead stop.

31. Audrea safely maneuver the F-150 to a complete stop remaining in the right side lane approoximatly around the 51mm. There were vehicles line up in front of us in both lanes bumper to bumper. A white chev truck in the left lane directly beside us and approoximatly seven (7) vehicle's were in the right lane directly behind us. There was approoximatly 3 vehicle's in the left lane directly behind us.

32. After approoximatly around 10 minutes of just sitting in traffic at a dead stop my son wanted a toy. As I was turning to pass my son O. J., a toy, I seen out the conner of my eye a 18 wheeler with a trailer attached to it rapidly descending toward us.

33. I immediately turn around and begin to warn Audrea that we were about to get hit from the rear, Audrea never heard the warning. I then turn around and used the passenger side mirror

and observed the following.

34. The defendents Coleman was approoximatly 50 feet to 100 feet from us and the crowed of stopped vehicles moving at a high rate of spend in the right lane. I could see a van with a uhaul attached trying to maneuver from the right lane to the left lane.

35. I then observe heavy smoke coming for the tires of Coleman vehicle. Approoximatly five secounds later I seen Coleman make contact with the U-Haul and van. The van immediately went air born, I feared that it was going to land on our vehicle.

36. I was terrified and started to cry. I yelled at my wife to go, go, please go are we going to die. Audrea had no ideal what I was talikng about.

37. The van landed up side down on the back right side of the Chev truck bed directly to the left hand side of our vehicle. The impact of the van landing caused the Chev and van both to slam into the left driver-side rear of our vehicle.

38. Approoximatly 3/4 of the way from the back door and rear bumper. The impact lifted both-rear tires of the F-150 off the ground forcing it to the right about 3 to 4 feet.

39. I Gregory Peet, did observe the following as to what happened to my son J. Y, caused by Coleman impacting the van sending it airborne .

40. As I Gregory was being abruptly and uncontrollably thrown to the left-side of the vehicle do to the impact of the chev and van stricken the left-side rear of our vehicle. I could hear my son J. Y., yelling and crying help me, mom help me I'm scared.

41. Approximately fifteen second latter as the Coleman continues to plow forcibly forward throughout the crowd of stopped vehicles uncontrollable; with catastrophically devastation affect to our live's and person's.

42. The F-150 we were in took a second direct-hit from the rear. The other cars behind us, were forcefully being pushed forawrd uncontrollably by Coleman. The impact felt like a locomontive train hit us in the back at 70 mph.

43. I, Gregory Peet, did observe the following as to what happened to my son JobAllen caused by the defendants impacting the other vehicles parked behind and beside use causing them to rear-end us.

44. I, Gregory head and 185 pounds body was forcefully thrown backwards stricken J. Y's head, chest, and abdominal areas. J. Y., nose and mouth immediately begins to bleed and swell.

45. J. Y's head immediately developed a golf ball size goose-eggs in the middle of the forehead area where the back of Gregory's head made direct contact.

46. JobAllen was yelling help me I'm hurting and struggling too breathe.

47. Approximately ten second latter as Coleman was still plowing forcibly forward throughout the crowd of stopped vehicles uncontrollable; with catastrophically domino affect to our live's and person's.

48. The other vehicles beind us, were still forcefully being pushed forawrd uncontrollably by the defendants causing a chain reaction. As such direct resulted in a forcefully direct-contact to the rear of our F-150.

49. This rear-impact forcing our vehicle to catapult forward forcing our direct-impact into the rear of the vehicles directly stopped in front of us pushing the sandwiched crowed forward approximately eight feet off to the right of the lane. The F-150 we were in then assuming its

9

50. J. Y., was still secured in his car seat yelling and crying uncontrollably for help.

51. Approximately ten to fifteen second latter as the defendents vehicle along with and full-size SUV trapped underneath it's front tires. Continued to plow forcibly forward throughout the crowd of stopped vehicles uncontrollable; with catastrophically domino affect to our live's and person's.

52. Coleman vehicle along with a full-size SUV trapped underneath the front tires then made a second direct-impact to the rear-right corner passenger-side of the F-150 rear-right tail light assembly, mid bumper and right quarter panel areas.

53. This horrendously double-direct-impact to the rear of our F-150 inflicted by Coleman vehicle and the trapped SUV. Catapulted our F-150 abruptly-uncontrollably forward from a dead stop to a rate of approximately 50 miles per hour directly toward the right toward the ditch.

54. J. Y., was still secured in his car seat yelling and crying uncontrollably for help.

55. Gregory managed to grab the steering wheel to try to gain control of the F-150 with the right hand.

56. Simultaneously and/or after traveling 15 to 20 feet, a vehicle that was ran over by the defendents and knock on to the right shoulder traveling to the left uncontrollably made a direct-impack to the right-side of the F-150.

57. Point of impack was from the right-side rear-view mirror area, impacting down all alone the entire right side of the F-150. This impack caused the out of control F-150 to run off the right-side of the road down and embankment and stalling out. J. Y., was still secured in his car seat yelling and crying uncontrollably for help.

## COUNT II
## THE FEDERAL MOTOR CARRIER SAFETY REGULATIONS SET FORTH THE APPLICABLE MINIMUM INDUSTRY STANDARD OF CARE TO ESTABLISH NEGLIGENCE, LACK OF CARE, RECKLESS AND WANTON CONDUCT

58. Plaintiff re-alleges the allegations contained in paragraphs one (1) through fiffty-seven (57) above as if though fully set forth herein.

59. The allegations contained in this Complaint regarding the Federal Motor Carrier Safety Regulations (FMCSR) establish that Defendants, LOGISTICS, CARGO and COLEMAN STRACHMAN, did not comply with the industry standard of care and the minimum standards of care described under the FMCSR to establish the negligence of Defendants and are not brought to allege a private cause of action for violation of the FMC SR .

60. The negligent actions and omissions of Defendant, COLEMAN STRACIIMAN, are the acts and omissions of his employer, Defendants. LOGISTICS and CARGO, under the doctrines of *Respondents Superior and Vicarious Liability* and, upon information and belief are negligent, careless, and wanton and include, but are not limited to:

A.) Following too closely;

B.) Inattentive operation of a commercial Motor vehicle on a public highway;

C.) Recklessly swerving a commercial vehicle from lane to lane on a public highway;

D.) Failure to stop or slow when traffic conditions made driving forward hazardous;

E.) Failure to maintain proper control of a commercial tracfor trailer;

F.) Driving at a speed in excess of what was reasonable for existing traffic conditions;

G.) Using a hand held cell phone while operating a commercial vehicle at highway speed in traffic on the roadway;

H.) Failure to keep a proper lookout for slowing or stopped traftlc ahead;

I.) Operation of a commercial Motor vehicle while dangerously fatigued;

J.) Failure to exercise ordinary and reasonable care in the maintenance of the mechanical condition of commercial vehicle;

K.) Failure to monitor for road construction ahead:

L.) Failure to take evasive action by driving to the right onto the roadway shoulder;

M.) Failure to keep a commercial vehicle in a single lane on the roadway;

N.) Failure to load or maintain a commercial vehicle properly so as to cause it to be unstable when operated on the highway;

0.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. §§ 381 through 399;

P.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 392.3 by operation of a commercial Motor vehicle while the driver's ability or alertness is impaired;

Q.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 391.ll(a) by operation of a commercial Motor vehicle when the driver is not properly qualitied pursuant to this regulation;

R.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 383.113 by operating a fleet vehicle and commercial Motor vehicle when the driver does not possess and demonstrate the safe driving skills required by this regulation;

S.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 383.111 by operating a fleet vehicle and commercial Motor vehicle without having sufficient basic knowledge of safe operating regulations, including the effects of fatigue, safety systems knowledge, basic knowledge of

basic control maneuvers, and basic information on hazard perception and when and how to make emergency maneuvers;

T.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 383.110 by operation of a fleet vehicle and commercial Motor vehicle without the knowledge and skills necessary to operate the same safely;

U.) For failing to meet the minimum duties and industry standards set forth under 49 C.F.R. § 390.11 by failing to observe and follow the FMCSR;

V.) For failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 383.110, 49 C.F.R. § 383.112, 49C.F.R. 383.113 by failing to have an adequate safety management controls in place that would require and provide that the driver had the required skills safety management controls required under this regulation;

W.) Upon information and belief using a cellular phone device, wireless communication device or other PDA device while operating a Motor vehicle and talking, texting or looking at GPS directions, thereby violating K.S.A. 8-15,111 and causing Defendant driver to be distracted;

X.) Upon information and belief Defendant, Driver, did not discontinue operation of the Commercial Motor Vehicle due to on-time requirements and penalties imposed by his employer, Defendants, LOGISTICS and CARGO; and

Y.) For other actions and omissions that will be supplemented after the receipt of full and complete discovery in this case.

## COUNT III
### NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION CLAIMS

61. Plaintiff re-alleges the allegations contained in paragraphs one (1) through sixty (60) above as if though fully set forth herein;

62. Upon information and belief, Defendants, LOGISTICS and CARGO, were negligent, careless, wanton and reckless for failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 391.11 and 49 C.F.R. § 391.21, 49 C.F.R. § 391.23 by failing to make appropriate investigation and inquiries of the driver's background in the prior ten (10) year period and by failing to obtain the federally required information on the application for employment of their driver with appropriate ten (10) year background checks, criminal history checks and obtaining actual responses from prior employers;

63. Upon information and belief, Defendants, LOGISTICS and CARGO, were negligent for failing to terminate, suspend, reprimand or retrain their driver in defensive driving, hazard perception techniques, accident awareness techniques, appropriate cushion understanding and.

64. Upon information and belief, Defendants, LOGISTICS and CARGO, were negligent for failing to retrain their driver in defensive driving skills, hazard perception skills and accident avoidance techniques;

65. Defendants, LOGISTICS and CARGO, were negligent, careless, wanton and reckless for failing to conduct a post-accident preventability study in order to comply with DOT, FMCSA and the mandates of the DOT and FMCSA that Motor carriers study accident preventability to prevent further accidents, injuries to the Motoring public;

66. Defendant, LOGISTICS and CARGO, were negligent, careless, wanton and reckless for failing to meet the minimum duties and industry standards of care set forth under 49 C.F.R. § 391.31 by failing to road test its driver properly;

67. Defendant, LOGISTICS and CARGO's, actions and omissions in hiring its driver, establish negligent hiring, retention, supervision, and training of the driver and supervisory managers above the driver;

68. Defendant, LOGISTICS and CARGO, and its respective agents, employees and representatives were careless, negligent and wanton for negligent hiring, training, supervision, and retention of Defendant driver, COLEMAN STRACHMAN, and his supervisory personnel.

69. Defendant, LOGISTICS and CARGO, negligently and/or wantonly hired unfit employees and agents and then failed to train, supervise, and monitor them properly and additionally retained employees and agents that were not performing their jobs properly or adequately. This includes, but is not limited to, Defendant driver, COLEMAN STRACHMAN, and his supervisory personnel.

70. Defendant, LOGISTICS and CARGO, had a duty to use reasonable care in selecting and retaining their employees, agents, and independent contractors, and was negligent in hiring, selection, training, monitoring and retaining their employees, agents, and independent contractors, including, but not limited to its driver.

71. Defendant, LOGISTICS and CARGO, negligently and wantonly failed to use reasonable care in the hiring, selecting, training, monitoring, and retention of their employees and agents, including, but not limited to driver.

72. Defendant, LOGISTICS and CARGO, knew or reasonably should have known that it was not hiring safe and competent employees and agents and negligently and wantonly violated their duty to hire only safe and competent employees.

73. Defendant, LOGISTICS and CARGO, knew or reasonably should have known that its employees and agents, including, but not limited to its driver, created an undue risk of harm to the Plaintiff, J. Y. Peet, and negligently and wantonly failed to reprimand, retrain, or terminate its employees, agents, and independent contractors, including Defendant driver, COLEMAN STRACHMAN, and his supervisory personnel.

74. Defendants, LOGISTICS and CARGO's negligence in hiring, training, monitoring,

15

supervision, and retention of unsafe and incompetent employees, agents, and independent contractors including the driver and his supervisory personnel proximately caused the injuries, pain and wrongful suffering of Plaintiff.

75. Defendants, LOGISTICS and CARGO, failed to have adequate safety protocols in place.

76. Defendants, LOGISTICS and CARGO, failed to create and implement a proper satety program that would require their driver to be adequately tested in written form to determine that he has appropriate defensive driving skills;

## COUNT IV
## PUNITIVE DARATIFICATION ESTABLISHED BY EXPRESS OR IMPLIED RATIFICATION

77. Plaintiffs re-allege the allegations contained in paragraphs one (1) through seventy-six (76) above as if fully set forth herein.

78. Plaintiff incorporate attached **Exhibit A, B, & C** from the DOT, FMCSR, and FMCSA documents in their entirety here to establish that Defendants, LOGISTICS and CARGO, have demonstrated a complete disregard for the FMCSRs, BASICs, and general industry standards of care, which proves both their express and implied ratification of their Driver's violation of these laws and establishes a company policy that turns a blind eye toward safety by allowing its drivers to operate their commercial motor vehicles longer than the maximum limit of hours of service permitted under the rules.

79. Upon information and belief Defendants, LOGISTICS and CARGO, have ratified all the negligent and reckless conduct of Defendant driver, COLEMAN STRACHMAN, that proximately caused this crash either expressly or impliedly. Upon information and belief, Defendant driver, COLEMAN STRACHMAN, was not reprimanded, suspended, terminated or retrained following this crash.

## COUNT V
## INJURIES AND DAMAGES OF THE PLAINTIFF

80. Plaintiff re-alleges the allegations contained in paragraphs one (1) through seventy-nine (79) above as if though fully set forth herein.

81. As a proximate result of the negligence and carelessness of Defendants, LOGISTICS and CARGO and COLEMAN STRACHMAN, as aforesaid, Plaintiff, J. Y. P    , suffered painful, catastrophic injuries to his body, mind and soul severely caused permanently disfiguration; and was otherwise injured and damaged. He suffered extreme conscious pain then and now to his back, neck, head and arm as a direct result of his injury's. A claim is hereby presented for, J. Y. Peet, injury's to his person and damages, suffered emotionally, physically and mentally. Plaintitff has been damaged in an amount in excess of FOUR HUNDRED THOUSAND DOLLARS ($ 400,000.00) non-economic damaes pain and suffering.

82. A claim is also presented for the medical expenses of J. Y. P   , under fedral laws. This claim includes, but is not limited to: both past and future mental anguish, suffering, or, advice or surgery or hospital bills prescription medication mental counseling or counsel; loss of filial care or attention; loss of care, training, guidance or education; and expenses of Plaintiffs J. Y. P  . These economic damages are in excess of FOUR HUNDRED SEVENTY FIVE THOUSAND DOLLARS ($475,000.00).

83. A claim is also presented for the services, care, lost wages, future earnings wages and guidance that Plaintiffs, J. Y.  Peet, would have provided to his family. These damages are in excess of ONE HUNDRED SEVENTY -FIVE THOUSAND DOLLARS ($175,000.00)

**WHEREFORE**, Plaintiff, J. Y. P.    , pray for judgment against Defendants, LOGISTICS and CARGO and COLEMAN STRACHMAN, for all damages allowed under Federal and State law as actual compensatory economic damages and non-economic in an amount in excess

of One Million Dollar's (1,000,000.00), for costs herein and for such other and further relief as the Court deems just and equitable.

DEMAND FOR DISCOVERY CONFERENCE, SCHEDULING CONFERENCE, PRETRIAL CONFERENCE AND JURY TRIAL

COME NOW Plaintiffs and demand the following:

1) An immediate discovery conference to obtain a scheduling order and trial date;

2) A pretrial conference date;

3) A trial by jury of no less than twelve (12) of his peers in this matter.

---

I declare (or certify, verify, or state) under te penalty of pejury under te laws of te United States of America that the foregoing is true and correct. Executed on 04/19/202 /date.

_____ -Date 04/19/2021
r-Child) singed by Gregory Peet (father)

311 Lee Avenue

Sikeston, Missouri 63801

Peety5252@gmail.com

573-270-6081